# EXHIBIT A

## Plaintiff's Deposition Excerpts

Page 1

1            UNITED STATES DISTRICT COURT
2          NORTHERN DISTRICT OF CALIFORNIA
3             SAN FRANCISCO DIVISION
4

5                                    )
   CHRISTOPHER OTEY, ON BEHALF )
6  OF HIMSELF AND ALL OTHERS    )
   SIMILARLY SITUATED,          )
7                               )
                                )
8           Plaintiff,          )
                                )
9           vs.                 )   No. C 12-5524 CRB
                                )
10 CROWDFLOWER, INC., LUKAS     )
   BIEWALD, AND CHRIS VAN PELT,)
11                             )
                               )
12          Defendants.        )
                               )

13
14
15
16         DEPOSITION OF CHRISTOPHER OTEY
17           San Francisco, California
18          Wednesday, May 22, 2013
19
20
21 Reported by:
   DIANE DEARMORE
22 CSR No. 12736
   Job No. 1604829
23
24
25 Pages 1 - 250

1    Q. By whom?
2    A. By a journalist for the Wall Street Journal.
3    Q. Okay. And what have you done with the notes
4  that you made to prepare for that interview with the
5  Wall Street Journal?
6    A. I don't think I've done anything with them.
7    Q. Do you still have them?
8    A. I believe so.
9    Q. Did you provide them to your attorneys?
10     MR. POTASHNICK: They've been produced.
11     MS. KALK: Okay.
12   A. Okay. Yes.
13   Q. (By Ms. Kalk) All right. Did you actually
14  interview with the Wall Street Journal about this case?
15   A. I did, yes.
16   Q. When was that?
17   A. I don't recall the exact date at this time,
18  but I think it was in March of this year. February or
19  March.
20   Q. And did you keep any notes or did you record
21  your discussion with them in any way?
22   A. No.
23   Q. Okay. And who was the news person you
24  interviewed with, the reporter?
25   A. I believe his name is Jeffrey. I don't

Page 54

1  remember his last name.
2    Q. Do you know if an article was ever printed
3  quoting you?
4    A. To my knowledge, an article wasn't created.
5    Q. Do you recall interviews with any other news
6  sources about this lawsuit?
7    A. No.
8    Q. Okay. Let's go back to when you started with
9  Amazon Mechanical Turk in 2010.
10   A. Okay.
11   Q. Were there any other agreement documents that
12  you're aware of that you had to click or accept with
13  Amazon Mechanical Turk, other than the participation
14  agreement, to begin seeing tasks?
15   A. Not that I recall at this time.
16   Q. Okay. So once you set up your account -- did
17  you have an Amazon account before that, or was this a
18  new account that you set up in 2010?
19   A. I believe it was a new account.
20   Q. Okay. And what information did you have to
21  provide?
22   A. To my knowledge, I had to provide my email
23  address and I believe just my name.
24   Q. Okay. Did you have to give a physical
25  address?

Page 55

1    A. I don't know if I had to give a physical
2  address to Amazon Mechanical Turk.
3    Q. Okay. And what email address did you use at
4  that point? Was it the dragonresides or the other one?
5    A. I believe it was the dragonresides.
6    Q. Okay. And other than when you switched over
7  to the jaclynfanclub, were there any other email
8  addresses that you've used with Amazon Mechanical Turk?
9    A. No.
10   Q. Tell me what happened once you started setting
11  up and seeing tasks. What did you see?
12   A. I saw a lot of work being offered.
13   Q. Am I correct that when you go onto the Amazon
14  Mechanical Turk, what you see is a number, and pages and
15  pages and pages of different types of tasks offered by
16  different task requesters?
17   A. Yes.
18   Q. And you can choose to open or not open any
19  particular task based on what you want to do?
20   A. Yes.
21   Q. So is it fair to say that you're the only
22  person who decides what task you will or will not open?
23   A. Yes.
24   Q. Okay. How did you decide which task to
25  perform initially?

Page 56

1    A. Initially I looked at the description of the
2  task, and then the amount.
3    Q. You mean the payment amount?
4    A. Correct.
5    Q. Am I correct that Amazon Mechanical Turk just
6  offers money for the tasks?
7    A. Yeah. All the payments on Amazon Mechanical
8  Turk is monitored.
9    Q. Right. It's not virtual rewards. It's
10  monetary?
11   A. Correct.
12   Q. So you look at the task, the contents of what
13  they're asking you to do, and what they were paying for
14  it?
15   A. Yes.
16   Q. Did you look at anything else in deciding
17  whether or not to open or perform a particular task?
18   A. Description, and the number of tasks
19  available.
20   Q. Why was the number of tasks available an
21  issue?
22   A. Because it would show how long I could work on
23  that task.
24   Q. So is it fair to say that you focused on tasks
25  that interested you?

Page 57

Pages 54 to 57

Page 114

1    Q.  You didn't know one way or the other where
2    they came from?
3        A.  I didn't know anything about the DIY.
4    Q.  You never signed any kind of contract with
5    CrowdFlower, did you?
6        MR. POTASHNICK:  I'm going to object to the
7    extent it calls for a legal conclusion.  But try your
8    best.
9        A.  Can you repeat the question?
10   Q.  (By Ms. Kalk)  Did you ever sign a contract
11   with CrowdFlower?
12       A.  No, I never signed a contract.
13   Q.  Did you ever receive an offer letter?
14       A.  No.
15   Q.  Did you ever get any kind of code of conduct
16   or terms and conditions of employment?
17       A.  Terms and conditions?  I have seen
18   CrowdFlower's terms and conditions, I believe.
19   Q.  Were you ever provided copies of terms and
20   conditions of employment?
21       A.  Not that I can recall at this time.
22   Q.  Okay.  And am I correct that you never
23   identified a task to perform through CrowdFlower's web
24   site?  You always went through Amazon Mechanical Turk,
25   right?

Page 116

1        A.  No.
2    Q.  Ira?
3        A.  No.
4    Q.  Jennifer Connor?
5        A.  No.
6    Q.  Was it any of the lawyers currently
7    representing you?
8        A.  No.
9    Q.  When did you first speak -- and, again, I
10   don't want the context of the conversation, just the
11   date.  When did you first speak to one of the lawyers
12   that is currently representing you in this lawsuit?
13       A.  I don't know the exact date at this time, but
14   I would -- best guess is either late August or September
15   2012.
16   Q.  Prior to filing this lawsuit, did you review
17   the complaint?
18       MR. POTASHNICK:  Do you know what a complaint
19   is?
20       THE WITNESS:  Could I get a little more of an
21   explanation?
22   Q.  (By Ms. Kalk)  The pleading that was filed to
23   start the lawsuit, the document that started this
24   lawsuit, did you review it, before filing, for accuracy?
25       A.  Yes.

Page 115

1        A.  That I'm aware of at this time, yes.
2    Q.  Did you ever even visit CrowdFlower's web site
3    before going to Amazon Mechanical Turk?
4        A.  I don't recall doing so, no.
5    Q.  When is the first time that you spoke to a
6    lawyer about suing CrowdFlower?
7        MR. POTASHNICK:  Don't --
8        MS. KALK:  I don't want the context.  Just the
9    date.
10       MR. POTASHNICK:  -- go into what was
11   discussed.
12   Q.  (By Ms. Kalk)  Yeah.  I just want the date.
13       A.  I don't know the exact date today, but I would
14   assume it's in the summer of 2012.
15   Q.  And which lawyer was that?
16       A.  I don't recall the name at this time.
17   Q.  Was it Mr. Potashnick?
18       A.  I did speak with Mr. Potashnick at one point.
19   Q.  Was he the first lawyer you spoke to about
20   filing this lawsuit?  Again, I don't want the context.
21   I just want to understand the first lawyer who you
22   talked to was.
23       A.  He wasn't the first, no.  I don't know the
24   first person's name.
25   Q.  Was it Ellen Doyle?

Page 117

1    Q.  And did you review the documents before they
2    were filed in this lawsuit?
3        A.  Yes.
4    Q.  Were they accurate?
5        A.  To the best of my knowledge, yes.
6        MR. POTASHNICK:  I have 12:15.  When is a good
7    time for lunch?
8        MS. KALK:  We can go whenever.  This is as
9    good a time to break as any.
10       MR. POTASHNICK:  All right.
11       (Lunch recess.)
12   Q.  (By Ms. Kalk)  Mr. Otey, during our break for
13   lunch, did you talk with anyone about the substance of
14   your testimony today?
15       MR. POTASHNICK:  Other than an attorney?
16   Q.  (By Ms. Kalk)  Including an attorney if it was
17   about the substance.  You're not allowed to talk about
18   the substance once the deposition starts.  The rules do
19   not allow you to talk about the substance of the
20   testimony once the deposition starts.
21       If you were to talk about "don't talk so
22   much," I don't care.  Have you talked to anyone about
23   the substance of your answers during any of your breaks
24   today?
25       A.  No.

Pages 114 to 117